# UNITED STATES DISTRICT COURT

**FILED**

EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION\*\*

APR 1 6 2026

Case No: 4: 26cv 389
Jordan / Davis

CLERK, U.S. DISTRICT COURT
TEXAS EASTERN

**ANTHONY JOHN GREER, JR., and**
**ALLISON GREER,**
**Plaintiffs,**

**v.**

**DALLAS IVF, PLLC;**
**DARA HAVEMANN, M.D.;**
**UNKNOWN EMBRYOLOGY TECHNICIAN;**
**UNKNOWN NURSE;**
**BAYLOR SCOTT & WHITE HEALTH;**
**BAYLOR UNIVERSITY MEDICAL CENTER;**
**OFFICER PRINGLE,**
**Defendants.**

## PLAINTIFFS' ORIGINAL COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL

## I. INTRODUCTION

Plaintiffs Anthony John Greer, Jr. and Allison Greer bring this action arising from Defendants' misconduct in connection with in vitro fertilization ("IVF") treatment, the handling and control of Plaintiffs' embryos, the withholding of critical medical and laboratory records, and the escalation of a private dispute into law enforcement action that resulted in unlawful restrictions on Plaintiffs' rights.

This case involves two interrelated courses of conduct.

First, Defendants Dallas IVF, PLLC, Dr. Dara Havemann, and associated personnel committed serious failures in the handling, identification, and control of Plaintiffs' embryos, including thawing an embryo contrary to Plaintiffs' explicit instructions, subjecting embryos to unauthorized manipulation, withholding critical laboratory records, and interfering with Plaintiffs' ability to continue fertility treatment.

Second, following Plaintiffs' efforts to obtain records and pursue legal remedies—including the filing of a verified petition under Texas Rule of Civil Procedure 202—Defendants escalated the

matter by invoking law enforcement, resulting in Plaintiffs being subjected to sweeping trespass restrictions and threats of arrest despite never having been present on the properties at issue.

These actions, taken individually and in concert, interfered with Plaintiffs' constitutional rights, including their right to petition the government, their right to access the courts, and their right to be free from unreasonable seizure, and deprived Plaintiffs of property and liberty interests without due process of law.

Plaintiffs seek relief under 42 U.S.C. § 1983, as well as under Texas statutory and common law, for the injuries and damages caused by Defendants' conduct.

# II. JURISDICTION AND VENUE

## A. Federal Question Jurisdiction

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims arising under the Constitution and laws of the United States, including claims under 42 U.S.C. § 1983 for violations of Plaintiffs' rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

## B. Supplemental Jurisdiction

This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as Plaintiffs' federal claims and arise from a common nucleus of operative facts.

## C. Venue

Venue is proper in the Eastern District of Texas, Sherman Division, pursuant to 28 U.S.C. § 1391(b), because:

- A substantial part of the events or omissions giving rise to the claims occurred in this District, including conduct occurring in Collin County, Texas;
- Defendants Dallas IVF, PLLC operate facilities within this District, including locations in Frisco and McKinney, Texas;
- Plaintiffs' Rule 202 proceeding was filed in Collin County, Texas;
- The conduct giving rise to the law enforcement action and resulting restrictions was directed at activities occurring within this District.

## D. Personal Jurisdiction

This Court has personal jurisdiction over Defendants because they reside in, conduct business in, and/or have committed acts giving rise to this action within the State of Texas, including within this District.

# III. PARTIES

## A. Plaintiffs

**Plaintiff Anthony John Greer, Jr.** is an individual and resident of Collin County, Texas. He is a consumer of Defendants' services and a co-owner of the embryos at issue. He brings claims individually and as a spouse of Plaintiff Allison Greer.

**Plaintiff Allison Greer** is an individual and resident of Collin County, Texas. She was a patient of Defendants and underwent IVF treatment giving rise to the claims asserted herein.

## B. Defendants

**Defendant Dallas IVF, PLLC** is a Texas professional limited liability company that provides fertility and reproductive medical services, including IVF treatment, and operates facilities in Frisco and McKinney, Texas. Dallas IVF may be served through its registered agent or principal place of business.

**Defendant Dara Havemann, M.D.** is an individual who, at all relevant times, was a physician employed by or acting on behalf of Dallas IVF, PLLC, and was directly involved in Plaintiffs' treatment. She is sued in her individual capacity for acts and omissions described herein.

**Defendant Unknown Embryology Technician** is an individual employed by or acting on behalf of Dallas IVF who participated in the handling, identification, and thawing of Plaintiffs' embryos. This Defendant's identity is presently unknown but will be substituted upon discovery.

**Defendant Unknown Nurse** is an individual employed by or acting on behalf of Dallas IVF who participated in Plaintiffs' treatment and consent process.
This Defendant's identity is presently unknown but will be substituted upon discovery.

**Defendant Baylor Scott & White Health** is a healthcare system operating facilities in Texas, including facilities associated with the events described herein.
This Defendant is responsible for policies, practices, and personnel involved in the law enforcement actions taken against Plaintiffs.

**Defendant Baylor University Medical Center** is a facility associated with Baylor Scott & White Health and is included as a Defendant based on its role in the events giving rise to Plaintiffs' claims.

**Defendant Officer Pringle** is an individual who, at all relevant times, was acting under color of state law as a law enforcement officer associated with Baylor Scott & White Health.
He is sued in his individual capacity for actions taken in enforcing trespass restrictions and threatening arrest.

# IV. FACTUAL BACKGROUND I

## A. Plaintiffs' Requests for Medical and Laboratory Records

Plaintiffs sought to obtain their complete medical and laboratory records from Defendants in connection with in vitro fertilization (IVF) treatment.

The requested records were necessary for:

- evaluating prior treatment;
- transferring care to another provider;
- understanding the handling and status of embryos;

- and assessing potential claims arising from Defendants' conduct.

Plaintiffs made multiple requests for records, including:

- written requests submitted by email;
- follow-up communications confirming prior requests;
- and direct communications with Defendants' staff and representatives.

Defendants acknowledged receipt of these requests.

Despite such acknowledgment, Defendants did not produce complete records.

## B. Shifting Requirements for Record Production

In response to Plaintiffs' requests, Defendants imposed varying and changing requirements for the release of records.

At different times, Defendants:

- indicated that authorization from Plaintiff Allison Greer was required;
- later required additional signatures from both Plaintiffs;
- required execution of Defendants' own authorization forms;
- directed Plaintiffs to complete electronic forms through proprietary systems.

These requirements were not presented as a single consistent process, but changed over time.

Plaintiffs continued to comply with requests to the extent possible and continued to seek production of records.

## C. Failure to Produce Critical Records

Defendants did not produce key categories of records, including but not limited to:

- embryology laboratory records;
- thaw and re-freeze documentation;
- chain-of-custody and tracking records for embryos;
- consent documentation relating to embryo selection and transfer;
- and internal communications relating to Plaintiffs' treatment.

These records remained within the exclusive possession, custody, and control of Defendants.

Plaintiffs were informed by a receiving provider that certain expected records had not been provided.

Defendants represented that records would be produced through an electronic system; however, Plaintiffs were unable to obtain complete records through that system.

## D. Impact on Medical Care and Decision-Making

As a result of the lack of records, Plaintiffs were unable to:

- fully evaluate prior treatment;
- provide complete information to a subsequent provider;
- make informed decisions regarding ongoing medical care;
- and ensure continuity of treatment involving embryos under Defendants' control.

The requested records were necessary for both medical and personal decision-making.

## E. Filing of Rule 202 Petition

Plaintiffs filed a Verified Petition for Pre-Suit Depositions and Production of Records pursuant to Texas Rule of Civil Procedure 202 on April 9, 2026, at 12:14 p.m., in the 493rd Judicial District Court of Collin County, Texas, Cause No. 493-02358-2026.

The petition sought:

- identification of individuals involved in Plaintiffs' treatment;
- production of missing medical and embryology records;
- preservation of evidence;
- and investigation of potential claims arising from Defendants' conduct.

The information necessary to pursue these matters remained within the exclusive possession, custody, and control of Defendants.

## F. Communications Restriction, Rule 202 Proceedings, and Service Requirements

Following the filing of that petition, Plaintiffs received written communication from counsel representing Dallas IVF dated April 10, 2026.

In that communication, Plaintiffs were:

- informed that they were forbidden from entering any Dallas IVF location;
- warned that law enforcement would be contacted and criminal charges pursued if they did so;
- instructed to cease all direct communication with Dallas IVF personnel;
- directed that all future communications must be made exclusively through counsel.

The communication further stated:

"At this point, any further direct communication by you with Dallas IVF will be considered stalking, and criminal charges will be pursued."

The communication also stated:

"Under Texas Rule of Civil Procedure 103, as a party to the lawsuit you filed in Collin County, you may not serve process in that suit. Therefore, you cannot use 'service of process' as a basis for entry onto Dallas IVF property or onto any other property to communicate with anyone affiliated with Dallas IVF."

At the time of this communication, Plaintiffs had filed a verified petition under Texas Rule of Civil Procedure 202.

Rule 202 provides that a person may petition the court to:

- perpetuate or obtain testimony for use in an anticipated suit; or
- investigate a potential claim or suit.

Rule 202 further provides that the petition and notice of hearing must be served on expected adverse parties in accordance with Rule 21a.

Texas Rule of Civil Procedure 21a provides that documents not filed electronically may be served:

- in person;
- by mail;
- by commercial delivery service;
- by fax;
- by email;
- or by such other manner as the court may direct.

Rule 21a further provides that service may be made by:

- a party to the suit;

- an attorney of record;
- or any other person competent to testify.

Following the April 10, 2026 communication:

- Plaintiffs were restricted from direct communication with Dallas IVF personnel;
- Plaintiffs were warned that further attempts to communicate could result in criminal allegations, including allegations of stalking;
- Plaintiffs were directed to route all communications exclusively through counsel;

These restrictions were communicated immediately following Plaintiffs' filing on April 9, 2026, and during the period in which Plaintiffs were:

- requesting records;
- attempting to obtain information necessary for their Rule 202 petition;
- and pursuing legal process in connection with anticipated claims.

The communication expressly tied potential criminal enforcement to Plaintiffs' conduct, stating that law enforcement would be contacted and charges would be pursued if Plaintiffs entered Dallas IVF locations or communicated directly with affiliated individuals.

Following this communication, the matter proceeded to law enforcement involvement, including contact with law enforcement officers, as described in the sections below.

Records requested by Plaintiffs were not fully produced.

## G. Law Enforcement Involvement and Trespass Enforcement

Following the April 10, 2026 communication from counsel for Dallas IVF, the matter escalated to law enforcement involvement.

Plaintiffs were contacted by a law enforcement officer identified as **Officer Pringle**.

During a recorded telephone call, Officer Pringle identified himself as a law enforcement officer associated with Baylor Scott & White Health and indicated that he was operating out of Dallas, Texas.

During that call, Officer Pringle indicated that the law enforcement action was initiated based on a complaint or request made by or on behalf of a third party associated with Dallas IVF.

## 1. Basis for Law Enforcement Action

During the call, Officer Pringle communicated to Plaintiffs that:

- a complaint had been made regarding Plaintiffs' conduct;
- law enforcement had been asked to intervene;
- Plaintiffs were considered subject to trespass restrictions;

The information provided to Plaintiffs indicated that the law enforcement response was based on information received from another party rather than independent observation.

## 2. Absence of Physical Presence

At all relevant times, Plaintiffs' interactions with Dallas IVF were limited to communications and requests for records.

Plaintiffs were not physically present at:

- the Dallas IVF location in Frisco, Texas;
- the Dallas IVF location in McKinney, Texas;
- or any facility associated with Baylor Scott & White Health.

Plaintiffs had not entered, attempted to enter, or engaged in any conduct on such properties that would give rise to a trespass violation.

## 3. Trespass Determination, Restrictions, and Threat of Arrest

Despite the absence of any physical presence, Plaintiffs were:

- informed that they were trespassed from Dallas IVF locations, including locations in Frisco and McKinney;
- informed that they were also trespassed from facilities associated with Baylor Scott & White Health;
- warned that attempting to enter those locations would result in law enforcement response;
- **expressly warned by Officer Pringle that Plaintiffs would be subject to arrest if they entered those locations;**

These restrictions and warnings were communicated through law enforcement.

## 4. Scope of Enforcement

The trespass determination was not limited to a single office or tenant space.

Instead, the restriction extended broadly to:

- multiple Dallas IVF locations, including Frisco and McKinney;
- facilities in which Dallas IVF operated as a tenant;
- and facilities associated with Baylor Scott & White Health.

The underlying complaint originated from a private entity leasing space within a larger medical facility.

Despite this, the resulting enforcement action extended beyond the leased premises and was applied to facilities associated with the broader hospital system.

No individualized determination was made with respect to each location.

---

## 5. Lack of Independent Verification

Upon information and belief, prior to communicating these restrictions, law enforcement did not independently verify:

- whether Plaintiffs had been present at the Dallas IVF locations in Frisco or McKinney;
- whether Plaintiffs had been present at any facility associated with Baylor Scott & White Health;
- whether any alleged conduct had occurred at those locations;
- whether a lawful basis existed for issuing a trespass warning across multiple properties;

The enforcement action was based on information provided by third parties.

---

## 6. Relationship to Ongoing Legal Process

The law enforcement involvement occurred during the same period in which:

- Plaintiffs had filed their Rule 202 petition on April 9, 2026;
- Plaintiffs were requesting medical and laboratory records;
- Plaintiffs were attempting to obtain information necessary to investigate their claims;

The timing of the law enforcement action followed immediately after:

- the filing of the Rule 202 petition; and

- the April 10, 2026 communication threatening criminal enforcement for continued contact.

## 7. Plaintiffs' Statements to Law Enforcement

During the recorded telephone call, Plaintiffs informed Officer Pringle that:

- Plaintiffs had an active civil proceeding pending in Collin County, Texas, including the Rule 202 petition filed on April 9, 2026;
- Plaintiffs were seeking records and investigating potential claims;
- Plaintiffs' conduct consisted of communications and requests for records related to that proceeding;

Plaintiffs further advised Officer Pringle that:

- Plaintiffs had not been present at any of the locations from which they were being trespassed;
- the information being relied upon originated from a third party;
- the circumstances involved an ongoing legal matter and requests for records;

Plaintiffs requested that Officer Pringle reconsider the actions being taken in light of the information provided during the call.

Officer Pringle continued to enforce the trespass determination and maintained the restrictions communicated to Plaintiffs.

## 8. Geographic Scope of Events and Enforcement

The events giving rise to Plaintiffs' requests for records and legal proceedings were centered in Collin County, Texas.

Plaintiffs' Rule 202 petition was filed in Collin County, Texas.

The Dallas IVF locations referenced in communications with Plaintiffs were located in:

- Frisco, Texas; and
- McKinney, Texas;

Both locations are within Collin County, Texas.

The law enforcement communication to Plaintiffs, including the trespass determination and related restrictions, was made in connection with conduct alleged to have occurred at locations in Collin County, Texas.

Officer Pringle identified himself as operating out of Dallas, Texas in connection with his role as a law enforcement officer associated with Baylor Scott & White Health.

## 9. Effect on Plaintiffs

As a result of the law enforcement involvement:

- Plaintiffs were deterred from attempting in-person efforts at Dallas IVF locations in Frisco and McKinney;
- Plaintiffs were deterred from accessing facilities associated with Baylor Scott & White Health;
- Plaintiffs' ability to communicate with Dallas IVF was impaired;
- Plaintiffs were placed under threat of arrest despite not having been present on the property;

These actions affected Plaintiffs' ability to continue pursuing records and legal remedies.

# V. FACTUAL BACKGROUND II

## A. IVF Treatment and Embryo Creation

Plaintiffs underwent IVF treatment with Defendants, resulting in the creation of approximately thirty (30) embryos, of which seventeen (17) fertilized and ten (10) were viable for transfer.

Of those viable embryos:

- seven (7) were male

- three (3) were female

These embryos were cryogenically preserved and remained under the exclusive custody, control, labeling, tracking, and handling systems of Defendants, including their embryology laboratory.

At all relevant times, Plaintiffs had no ability to access, verify, or independently confirm embryo identity, and were entirely dependent on Defendants' internal safeguards.

## B. Reliance on Dr. Havemann

Prior to treatment, Plaintiffs reviewed Defendants' publicly available representations regarding Dr. Dara Havemann, M.D., including statements contained in her professional biography published by Defendants.

In that biography, Dr. Havemann represents that:

• she personally suffered from infertility related to PCOS
• she underwent IVF treatment herself
• she successfully conceived through IVF, including through frozen embryo transfer

These representations were made publicly by Defendants as part of their marketing and patient-facing materials and were intended to inform and influence prospective patients in selecting a fertility provider.

Plaintiffs relied on these representations because:

• Plaintiff Allison Greer suffers from PCOS
• IVF success in PCOS patients depends heavily on timing, embryo handling, and uterine preparation
• Plaintiffs specifically sought a physician who understood PCOS-related infertility both clinically and personally

These publicly advertised representations created a heightened level of trust that:

• Defendants would follow proper embryo handling procedures
• Defendants would disclose risks honestly
• Defendants would exercise heightened care during critical decision points

Plaintiffs selected Defendants and proceeded with treatment in reliance on these representations.

## C. Selection and Instruction Regarding Embryo

Prior to the scheduled embryo transfer, Plaintiffs were required to execute written consent forms specifying the embryo to be transferred.

On or about the days leading up to the procedure, Plaintiffs reviewed and signed consent documentation in the presence of Defendants' staff, including a nurse, expressly selecting a female embryo for transfer, specifically indicating their choice of the best available female embryo.

The nurse present during this process also signed the documentation, confirming Plaintiffs' selection and the accuracy of the information recorded.

This selection was:

• formally documented in Defendants' records
• witnessed and acknowledged by clinical staff
• reaffirmed verbally immediately prior to the procedure

At no point did Plaintiffs authorize the thawing or transfer of a male embryo.

This instruction was clear, specific, and non-discretionary, and did not involve or require the exercise of medical judgment.

## D. Breakdown of Embryo Identification Protocol

Despite clear instructions, Defendants thawed a male embryo.

This error necessarily indicates failure of one or more required safeguards, including:

- patient-to-embryo matching
- labeling verification
- two-person or witness verification protocols
- chain-of-custody controls within the embryology lab

At the time of the error, the embryo was:

- stored
- selected
- handled

within a controlled laboratory environment, not during active medical treatment.

## E. Delay, Isolation, and Impaired Decision-Making

After informing Plaintiffs that a male embryo had been thawed contrary to their documented selection, Defendants' staff exited the procedure room to locate the physician.

Plaintiffs were then left alone, without explanation or guidance, for a prolonged period of approximately one hour during an ongoing and time-sensitive medical procedure.

During this period:

• Plaintiffs were in a heightened state of emotional distress
• no information was provided regarding the status of their embryos
• no options were explained

- no risks were disclosed
- no medical guidance or support was provided

Defendants did not promptly disclose the full circumstances or implications of the laboratory error. Instead, disclosure occurred only after the physician returned following this extended delay.

By that time, Plaintiffs remained in a distressed and vulnerable condition and were required to make an immediate decision regarding whether to proceed. The timing and manner of this delayed disclosure materially impaired Plaintiffs' ability to fully process information, consider alternatives, or provide informed consent under appropriate and non-coercive conditions.

## F. Misrepresentation Under Distress and Lack of Informed Consent

When Defendant Havemann entered the room after the delay, she informed Plaintiffs that a female embryo could still be thawed and transferred and characterized the situation as "not a big deal."

At no point did Defendants disclose material information necessary for informed decision-making, including:

- the impact of rapid thawing under altered conditions
- the effect of a prior laboratory error on procedure integrity
- the risks associated with proceeding without delay or reassessment
- any potential reduction in embryo viability or success rates
- the option to postpone or cancel the procedure

These representations and omissions occurred immediately following a prolonged period of emotional distress and uncertainty, during which Plaintiffs had been left without information or guidance.

Under these conditions, Plaintiffs reasonably relied on Defendants' statements and were induced to proceed with the transfer without a meaningful opportunity to evaluate risks or alternatives, thereby vitiating any purported informed consent.

## G. Rapid Thaw Under Compromised Conditions

Following the laboratory error, Defendants proceeded to rapidly thaw a female embryo and perform the transfer.

This occurred:

- after a known laboratory error
- without pause for reassessment
- without renewed informed consent
- without disclosure of risks associated with altered conditions

The transfer was performed under time-compressed and compromised circumstances.

Upon information and belief, based on the embryo image provided to Plaintiffs at the time of transfer (identified as embryo number 3), the embryo had not fully re-expanded or reached an optimal post-thaw condition prior to transfer.

Defendants proceeded with implantation despite the observable condition of the embryo and without providing Plaintiffs any explanation regarding its status or readiness.

The transfer ultimately failed.

The compromised conditions under which the embryo was thawed and transferred, including the lack of reassessment and the embryo's apparent incomplete recovery following thaw, materially reduced the likelihood of successful implantation and contributed to the failure of the transfer.

## H. Unauthorized Freeze–Thaw Cycle

The male embryo that had been mistakenly thawed was subsequently refrozen by Defendants.

This action subjected the embryo to an additional, unnecessary freeze–thaw cycle, exposing it to conditions that can degrade embryo quality and adversely affect viability.

This manipulation was not part of any planned or medically indicated treatment. It occurred solely as a result of Defendants' prior error and was undertaken:

- without Plaintiffs' knowledge or consent
- without disclosure of associated risks
- in direct contradiction of Plaintiffs' instructions

At no time did Defendants obtain authorization to subject the embryo to an additional freeze–thaw cycle, nor did they provide any explanation as to the impact such manipulation could have on the embryo's condition or future usability.

This non-therapeutic handling of the embryo occurred while it remained under the exclusive custody and control of Defendants.

## I. Pattern of Delays, Medication Changes, and Physical Impact

Prior to the second embryo transfer, Defendants repeatedly delayed the procedure while continuing to direct Plaintiff Allison Greer to undergo ongoing hormonal preparation.

During this period, Defendants:

• repeatedly modified and adjusted medication dosages
• required continued use of hormone-based medications, including vaginally administered medications
• continued billing for treatment despite the lack of progression toward a stable transfer window

These repeated delays and medication changes resulted in prolonged and fluctuating hormonal exposure.

As a patient diagnosed with PCOS, Plaintiff Allison Greer is particularly sensitive to hormonal fluctuations. The repeated adjustments in medication and extended treatment cycle caused:

• increased physical discomfort and pain
• hormonal instability
• exacerbation of PCOS-related symptoms
• risk of additional ovarian cyst development

After numerous delays and medication adjustments, Defendants informed Plaintiffs that Plaintiff Allison Greer's uterine lining was "good enough" to proceed with transfer.

Defendants did not represent that conditions were optimal, nor did they explain the potential impact of proceeding under suboptimal conditions.

Upon information and belief, Defendants elected to proceed with the transfer despite not achieving optimal preparatory conditions and without providing Plaintiffs a meaningful opportunity to delay until such conditions could be achieved.

## J. Pre-Determined Termination While Continuing Treatment

On or about August 19, Defendants made the decision to terminate the physician–patient relationship with Plaintiffs.

Despite having already made this decision, Defendants did not inform Plaintiffs and instead continued to actively manage and direct their care.

Between August 19 and the date of the second embryo transfer, Defendants:

• continued prescribing and adjusting medications
• continued monitoring and preparing Plaintiff Allison Greer for transfer
• continued billing for services associated with the procedure
• proceeded with performing the embryo transfer on or about August 23

At no point prior to the procedure did Defendants disclose that the physician–patient relationship had already been terminated or that they did not intend to continue providing care following the transfer.

Plaintiffs reasonably relied on Defendants' continued treatment and conduct as an indication that care was ongoing and would continue through the completion of the treatment cycle.

Had Plaintiffs been informed prior to the procedure that Defendants had already decided to terminate the physician–patient relationship, Plaintiffs would not have proceeded with the embryo transfer. Instead, Plaintiffs would have ceased treatment and sought care from an alternative fertility provider who could offer continuity of care and appropriate attention to Plaintiff Allison Greer's medical condition, including her PCOS. Defendants' failure to disclose this information deprived Plaintiffs of the opportunity to make an informed and meaningful decision regarding whether to proceed.

## K. Post-Procedure Termination During Recovery

Only after the embryo transfer had been completed did Defendants provide formal notice of termination.

Plaintiffs received a certified letter informing them that the physician–patient relationship had been terminated, which was delivered approximately two days after the procedure.

At the time the letter was received, Plaintiff Allison Greer was:

• in the immediate post-transfer period
• following strict medical instructions requiring rest and limited activity
• physically recovering from the procedure
• emotionally vulnerable following the prior failed transfer and ongoing treatment

The timing of this termination—after completion of the procedure and during the critical post-transfer period—deprived Plaintiffs of continuity of care and the ability to seek alternative medical support during a medically sensitive phase.

Defendants did not provide adequate transition planning, referral, or continuity measures prior to terminating care.

## L. Loss of Opportunity to Seek Alternative Care

Defendants' failure to disclose their decision to terminate the physician–patient relationship prior to the embryo transfer deprived Plaintiffs of the opportunity to seek alternative medical care.

At the time of the second transfer, Plaintiffs were actively engaged in treatment and reasonably believed that Defendants would continue to provide care through the completion of the IVF cycle.

Had Plaintiffs been informed of Defendants' intent to terminate care, they would have:

• halted the planned transfer
• discontinued ongoing treatment under Defendants' direction
• sought evaluation and treatment from another fertility provider
• pursued a transfer under conditions providing continuity of care and appropriate medical oversight

By withholding this information, Defendants deprived Plaintiffs of a meaningful opportunity to make informed decisions regarding their treatment and reproductive options.

## M. Withholding of Laboratory Records and Identification Information

Plaintiffs requested records relating to the embryo thawing, handling, and transfer procedures.

Defendants failed and/or refused to produce critical laboratory documentation, including:
• embryology logs documenting embryo handling and status
• chain-of-custody records tracking embryo identification and movement
• thaw and re-freeze records reflecting timing and conditions
• incident reports or internal documentation relating to the laboratory error

These records are routinely generated and maintained in the ordinary course of IVF laboratory operations and are essential to ensuring proper embryo identification, tracking, and handling.

The requested records are fundamental to determining:
• how the incorrect embryo was selected and thawed
• which required safeguards and verification protocols failed
• whether proper procedures were followed after the error was discovered
• the identity and role of the embryology personnel involved

Defendants also failed and/or refused to identify the embryology technician responsible for thawing the incorrect embryo.

Despite Plaintiffs' repeated communications and escalation of concerns, Defendants continued to withhold or fail to produce these records while maintaining exclusive control over all documentation necessary to evaluate the laboratory error.

All such information remains exclusively within Defendants' possession, custody, and control. Upon information and belief, Defendants' failure to produce these records and identify responsible personnel has impeded Plaintiffs' ability to fully determine the circumstances of the laboratory error and to evaluate whether proper protocols were followed.

This withholding occurred contemporaneously with Defendants' continued control over Plaintiffs' embryos and refusal to timely release them.

### N. Failure to Timely Provide Records and Interference with Continuity of Care

Following the events described above, Plaintiffs sought to continue fertility treatment with an alternative provider.

In order to do so, Plaintiffs requested that Defendants produce and transmit complete medical and laboratory records, including embryology records, consent documentation, and records necessary to ensure continuity of care.

Plaintiffs provided valid written authorization directing Defendants to transmit these records to the receiving fertility clinic.

Despite this authorization, Defendants failed to timely provide complete records and failed to transmit critical documentation necessary for continued treatment.

The records withheld or not timely produced included, but were not limited to:
• informed consent documentation
• embryology laboratory records
• thaw and re-freeze records
• chain-of-custody and embryo identification records

These records were necessary for:
• evaluation by the receiving provider
• continuity of fertility treatment
• safe and informed decision-making regarding further embryo transfer

Defendants' failure to timely provide these records interfered with Plaintiffs' ability to continue treatment and obtain appropriate medical care.

These delays occurred despite Plaintiffs' explicit communications rejecting additional administrative barriers and requesting transfer of care to a new provider.

The acts described herein were administrative, custodial, and ministerial in nature and did not involve the exercise of medical judgment.

### O. Demand for Release of Embryos and Defendants' Delay

Prior to the October 23, 2024 notarized authorization, Plaintiffs had already communicated their intent to transfer embryos to another provider and had rejected Defendants' additional consent requirements, placing Defendants on notice of Plaintiffs' position as early as September 27, 2024.

On or about October 23, 2024, Plaintiffs provided Defendants with a valid, notarized written authorization directing the release and transfer of their cryopreserved embryos to a new fertility provider.

Plaintiffs complied with all requirements necessary to effectuate the transfer and made a lawful demand for release of the embryos.

Despite this, Defendants did not release the embryos.

On October 29, 2024, Plaintiffs followed up after being informed that Defendants were "not ready to proceed" and that the request was under internal administrative review.

Defendants continued to delay the release of the embryos despite having received all necessary documentation and despite having been on prior notice of Plaintiffs' intent to transfer care.

The embryos were not released until approximately November 7, 2024.

This delay was not based on any medical necessity, safety concern, or regulatory requirement. Instead, the delay was administrative and occurred after Plaintiffs had raised concerns regarding Defendants' prior handling of embryos.

At all relevant times, the embryos remained under the exclusive possession and control of Defendants.

## P. Conditional Release and Coercive Conduct

During the period of delay, Defendants conditioned, or attempted to condition, the release of Plaintiffs' embryos on Plaintiffs' agreement to execute additional documents, including modified consent forms or waivers.

Defendants expressly informed Plaintiffs that additional internal consent forms, notarization, and payment of fees were required before embryos would be released.

These requirements included execution of Defendants' own documentation, notarization of such forms, and payment of a coordination fee as a prerequisite to release.

These documents were not required under the original agreement governing storage and disposition of the embryos, and were imposed despite Plaintiffs having already provided valid authorization for transfer and having rejected additional consent requirements.

Upon information and belief, these documents contained terms that:
• mischaracterized prior events
• limited or impaired Plaintiffs' legal rights
• were intended to benefit Defendants in light of the prior laboratory error

Plaintiffs refused to execute such documents.

Despite Plaintiffs having already provided valid authorization for transfer, Defendants continued to withhold the embryos and insisted on compliance with these additional internal requirements.

By doing so, Defendants placed Plaintiffs in a coercive position:
• either execute documents favorable to Defendants
• or forfeit timely access to their embryos and ability to proceed with treatment

These actions were administrative and custodial in nature and did not involve the exercise of medical judgment, but instead reflected Defendants' control over Plaintiffs' property and the conditions under which it would be released.

This conduct occurred while Defendants retained exclusive control over Plaintiffs' embryos and while Plaintiffs' ability to proceed with treatment was time-sensitive.

## Q. Time-Sensitive Harm and Loss of Treatment Opportunity

Defendants knew or should have known that:
• IVF treatment is time-sensitive
• delays in embryo transfer materially affect treatment outcomes
• Plaintiffs' ability to continue treatment was constrained by insurance coverage expiring at the end of the calendar year

Despite this knowledge, and despite Plaintiffs' timely efforts to transfer care, Defendants delayed the release of embryos.

As a direct result of Defendants' delay, Plaintiffs were unable to complete an additional IVF transfer cycle before the expiration of their insurance coverage.

This resulted in:
• loss of insurance-covered treatment
• increased out-of-pocket costs
• delay in achieving pregnancy
• loss of reproductive opportunity

Defendants' actions interfered with Plaintiffs' ability to exercise control over their embryos and to obtain timely medical care.

### R. Post-Release Mishandling of Embryos During Transfer

Following the delayed release of embryos, Defendants further mishandled Plaintiffs' embryos during the transfer process to the receiving provider.

Defendants admitted that embryos not intended for transfer, including aneuploid (genetically abnormal) embryos, were mistakenly sent as part of the transfer shipment.

This error demonstrates a breakdown in embryo identification, classification, and release protocols occurring after Plaintiffs had already demanded release and after Defendants had delayed the transfer.

The mistaken inclusion of embryos not designated for transfer reflects continued failures in Defendants' internal tracking, labeling, and verification systems governing embryo handling.

This conduct demonstrates that Defendants' failures were ongoing and not limited to a single incident.

These acts occurred while the embryos remained under Defendants' custody and control and were administrative and laboratory in nature, not the result of medical judgment.

This additional mishandling further interfered with Plaintiffs' ability to proceed with informed and orderly fertility treatment and caused additional confusion, delay, and emotional distress.

## S. STATE ACTION / COLOR OF LAW ALLEGATIONS

Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

This action includes claims under 42 U.S.C. § 1983 arising from conduct undertaken under color of state law and through joint participation between private and law-enforcement actors.

Although certain Defendants are private entities or private individuals, the conduct alleged herein was not purely private conduct. Rather, upon information and belief, those Defendants acted jointly with, invoked, directed, encouraged, and/or substantially participated in the use of law enforcement authority to impose restraints, threats of arrest, and access restrictions against Plaintiffs in response to Plaintiffs' lawful efforts to obtain records, investigate claims, and pursue judicial relief.

At all relevant times, Plaintiffs were engaged in lawful activity protected by the United States Constitution, including:

- requesting their own medical and laboratory records;
- seeking records necessary for continuity of care;
- investigating potential civil claims;
- preparing for and filing a verified petition under Texas Rule of Civil Procedure 202;
- attempting to preserve evidence and identify responsible persons;
- pursuing access to the courts and redress of grievances.

Rather than timely complying with their obligations under federal and Texas law governing access to medical records and related treatment documentation, Defendants escalated the dispute from an administrative and records matter into a law-enforcement matter.

The progression of events demonstrates a retaliatory and escalating pattern.

Plaintiffs repeatedly sought production of records necessary to understand Defendants' handling of embryos, continue treatment with another provider, and evaluate potential claims. Those records included medical records, embryology records, chain-of-custody documentation, thaw and re-freeze records, consent records, and related treatment documentation that remained within Defendants' exclusive possession, custody, and control.

Instead of producing complete records in a timely and straightforward manner, Defendants imposed shifting requirements, inconsistent demands, and additional administrative barriers. These included changing signature requirements, demands for Defendants' preferred forms, electronic portal requirements, additional execution demands, and other obstacles not presented as a single clear or consistent process.

Upon information and belief, these shifting requirements were not merely administrative confusion. Rather, they formed part of a pattern of obstruction that hindered Plaintiffs' ability to obtain records, understand what had occurred during treatment, transfer care, identify responsible personnel, and meaningfully investigate legal claims.

When Plaintiffs continued pressing for records and then filed a verified Rule 202 petition in Collin County on April 9, 2026, the escalation accelerated.

The timing is significant. Plaintiffs' Rule 202 petition was a lawful court filing expressly aimed at investigating potential claims, identifying responsible persons, securing records, and preserving evidence. It was a formal invocation of judicial process and a constitutionally protected effort to petition the government for redress of grievances.

Immediately after Plaintiffs invoked that process, Defendants did not de-escalate, clarify, or simply comply with their legal obligations regarding records. Instead, the response shifted from delay and obstruction to threat and coercion.

As alleged above, counsel for Dallas IVF sent written communication dated April 10, 2026, one day after the Rule 202 petition was filed. That communication did not merely address litigation logistics. It imposed broad restrictions and threatened criminalization of further contact.

Among other things, Plaintiffs were told:

- they were forbidden from entering any Dallas IVF location;
- law enforcement would be contacted if they did so;
- criminal charges would be pursued;
- all future communications must be routed exclusively through counsel;
- further direct communication would be treated as "stalking."

This was not a neutral response to an ordinary administrative issue. The communication expressly linked Plaintiffs' continuing attempts to obtain information and pursue their claims with threatened criminal consequences.

That threat was particularly significant because Plaintiffs had not alleged that they intended unlawful conduct. They were seeking records, investigating claims, and pursuing court process. The threatened use of criminal allegations and police intervention therefore functioned as a coercive response to Plaintiffs' exercise of legal rights.

The retaliatory character of this conduct is reinforced by the fact that the core underlying dispute did not require police intervention at all. The matter originated as a records dispute and treatment-related dispute. Defendants could have complied with their obligations by timely producing records, identifying responsible personnel, preserving relevant evidence, and allowing Plaintiffs to pursue continuity of care without obstruction.

Instead, rather than comply with obligations under HIPAA and Texas law concerning access to medical records and related treatment documentation, Defendants chose escalation.

Upon information and belief, after Plaintiffs persisted in seeking records and filed the Rule 202 petition, Dallas IVF and/or persons acting on its behalf contacted or caused contact with law enforcement and requested intervention against Plaintiffs.

Upon information and belief, the law-enforcement response was not the result of independent police initiation, but of a complaint, request, or representation made by private parties associated with Dallas IVF and/or Baylor-affiliated personnel.

During the recorded telephone call described in the complaint, Officer Pringle informed Plaintiffs that law enforcement involvement had been triggered by a complaint or request made by or on behalf of another party. The information communicated to Plaintiffs indicated that the resulting enforcement action was derivative of private-party assertions rather than based upon an independently developed law-enforcement investigation.

That distinction is critical.

Private persons do not become state actors merely by contacting police. However, when private persons and law-enforcement officers act in concert, when police power is invoked to accomplish a private objective, when officers rely on private representations without meaningful independent investigation, or when private and state actors jointly impose restrictions that burden constitutional rights, the conduct may constitute action under color of state law.

That is what is alleged here.

Upon information and belief, Dallas IVF and/or affiliated persons did more than simply report facts and step aside. Rather, they actively sought law-enforcement intervention as a means of enforcing private restrictions, suppressing Plaintiffs' continued attempts to seek records and pursue legal remedies, and deterring Plaintiffs from pressing their claims.

The resulting police action was sweeping in scope and disproportionate to any legitimate property concern.

Plaintiffs were informed by Officer Pringle that they had been trespassed not merely from a single private office suite or limited leased premises, but from multiple Dallas IVF locations, including Frisco and McKinney, and also from facilities associated with Baylor Scott & White Health.

This broad restriction is significant for multiple reasons.

First, Plaintiffs allege they had not been physically present at the properties from which they were purportedly trespassed. Plaintiffs had not entered, attempted to enter, or engaged in conduct at those locations that would ordinarily provide a factual basis for a trespass warning.

Second, the scope of the restriction extended beyond any single private office or tenant area and instead swept across multiple properties and facilities. Upon information and belief, such breadth could not have been imposed absent law-enforcement adoption and enforcement of a private request or narrative.

Third, the extension of restrictions to Baylor-associated facilities reflects use of institutional and police authority far beyond what would have been necessary to address any ordinary private-property concern.

Fourth, the restrictions were accompanied by explicit threats of arrest. This was not a mere request to avoid contact. It was a law-enforcement-backed deprivation of liberty, movement, and access interests.

Upon information and belief, prior to communicating these restrictions and threats, Officer Pringle and/or other associated law-enforcement personnel did not meaningfully verify whether Plaintiffs had actually been present at the properties in question, whether Plaintiffs had engaged in any conduct supporting trespass enforcement, whether the complaint was factually reliable, or whether a lawful basis existed to extend trespass restrictions across multiple locations and facilities.

Instead, the allegations support the inference that law enforcement accepted and enforced the private Defendants' characterization of Plaintiffs and their conduct without adequate independent investigation.

That alleged failure of independent investigation matters because it shows joint participation rather than independent governmental judgment.

Where police merely exercise their own independent judgment, a private complainant may remain a private actor. But where police power is effectively used as the enforcement arm of a private party's retaliatory objective, where law enforcement adopts the private party's accusations without meaningful verification, and where restrictions are imposed to deter protected activity, the private party's conduct is fairly attributable to the state.

That is especially true here because the objective being suppressed was not random contact or unrelated behavior. It was Plaintiffs' effort to obtain records, identify responsible persons, preserve evidence, and prosecute a Rule 202 proceeding in anticipation of civil claims.

The chronology supports retaliatory motive.

Plaintiffs requested records.

Defendants delayed and imposed shifting requirements.

Plaintiffs persisted.

Plaintiffs filed a Rule 202 petition.

Immediately thereafter, Defendants' response escalated to threats of criminal accusations, prohibition of contact, and law-enforcement-backed trespass restrictions.

This sequence supports a plausible inference that Defendants chose escalation because Plaintiffs moved the dispute into formal legal process and thereby threatened to expose misconduct through court-supervised discovery and record preservation.

Upon information and belief, the threatened criminalization of contact, the broad trespass restrictions, and the invocation of police authority were not undertaken for legitimate safety reasons, but for retaliatory, coercive, and obstructive purposes, including:

- deterring Plaintiffs from continuing to pursue records;
- obstructing Plaintiffs' Rule 202 proceeding;
- increasing the cost and difficulty of Plaintiffs' investigation;
- chilling Plaintiffs' willingness to seek in-person relief or pursue evidence;
- discouraging Plaintiffs from pursuing anticipated civil claims;
- using state-backed coercion to obtain compliance, silence, or abandonment.

This inference is strengthened by the absence of any need for escalation had Defendants simply complied with their ordinary legal obligations. Plaintiffs were seeking their own records and related treatment documentation. Those records were essential to continuity of care and claim investigation. The lawful and obvious path was production, not punishment.

Instead, Defendants transformed a records dispute into a police matter.

Upon information and belief, Baylor Scott & White-related actors also participated in and/or facilitated this escalation. Officer Pringle identified himself as a law-enforcement officer associated with Baylor Scott & White Health. The trespass restrictions communicated to Plaintiffs extended to facilities associated with Baylor Scott & White Health. The enforcement action thus was not limited to Dallas IVF's leased premises but was expanded through the authority, infrastructure, and enforcement mechanisms associated with Baylor-affiliated law enforcement.

To the extent Baylor-affiliated personnel, departments, administrators, security officials, or law-enforcement decisionmakers approved, adopted, communicated, expanded, or enforced those restrictions based on the private complaint at issue, such conduct constituted joint participation in the deprivation of Plaintiffs' rights.

Upon information and belief, Baylor-related actors did not act as neutral third parties. Rather, they provided the enforcement mechanism through which the private Defendants' objectives were carried out.

The law-enforcement component of the scheme was essential. Without police involvement and threats of arrest, Defendants' private demands would have remained merely private demands. By invoking and securing police-backed enforcement, Defendants converted a private effort to obstruct and intimidate Plaintiffs into conduct fairly attributable to the state.

The conduct alleged herein therefore satisfies, at minimum, the joint-action and conspiracy theories of state action.

Under a joint-action theory, private actors become state actors when they are willful participants in joint conduct with the state or its agents. Here, upon information and belief, Dallas IVF and associated personnel willfully participated with law-enforcement actors by initiating complaints, providing information, requesting enforcement, and obtaining police-backed trespass restrictions and arrest threats that burdened Plaintiffs' rights.

Under a conspiracy theory, private actors act under color of law when they reach an understanding with state actors to accomplish an unlawful objective or a lawful objective by unlawful means. Here, upon information and belief, private and law-enforcement actors reached an understanding—express or tacit—to treat Plaintiffs' lawful pursuit of records and court process as grounds for coercive restriction and threatened criminal enforcement.

The unlawful objective and/or unlawful means included:

- retaliating against Plaintiffs for invoking court process;
- burdening Plaintiffs' right to petition and access the courts;
- imposing sweeping trespass restrictions unsupported by individualized factual basis;
- threatening arrest without adequate justification;
- leveraging state power to suppress further attempts to obtain information and pursue claims.

The state involvement was substantial and direct. Officer Pringle did not merely pass along a private message. He communicated official law-enforcement restrictions, represented that Plaintiffs were trespassed from multiple locations, and warned Plaintiffs that they would be arrested if they entered those places. That show of governmental authority imposed real and immediate restraints on Plaintiffs' liberty and conduct.

The use of police-backed trespass enforcement in these circumstances was particularly coercive because Plaintiffs had already been told by private counsel that further direct communication

could be characterized as "stalking" and could result in criminal charges. Thus, the private threat and the state-backed enforcement operated together as part of one escalating course of conduct.

Upon information and belief, that course of conduct was intended to accomplish what Defendants had been unwilling to accomplish through lawful transparency and compliance: to silence Plaintiffs, isolate them, discourage continued pressure for records, and impede further legal action.

This course of conduct also bears the hallmarks of retaliation.

Plaintiffs engaged in protected activity.

Defendants were aware of that activity.

Defendants responded with threats, restrictions, and police involvement.

The response closely followed the protected activity in time.

The response would deter a person of ordinary firmness from continuing to seek records, pursue legal proceedings, or investigate claims.

The retaliatory motive is plausibly inferred from the chronology, the escalation, the absence of a legitimate need for such sweeping enforcement, and the obvious alternative available to Defendants: comply with medical-records obligations and allow lawful judicial process to proceed.

Upon information and belief, Defendants' refusal to timely provide records and their subsequent use of police power were not isolated acts, but part of a continuous pattern of obstruction and retaliation. The same dispute that began with withholding records and imposing shifting administrative barriers culminated in criminal threats, broad trespass directives, and threatened arrest. The escalation was linear, connected, and purposeful.

The conduct was undertaken under color of law because state authority was invoked, adopted, and applied to carry out a retaliatory and obstructive private objective.

As a direct and proximate result of this joint conduct, Plaintiffs suffered constitutional injury, including but not limited to:

- interference with their right to petition the government for redress of grievances;
- impairment of their right of access to the courts;
- restriction of movement and liberty through police-backed trespass warnings;
- deprivation of liberty and property interests without due process;
- chilling of further protected efforts to seek records, investigate claims, and pursue relief;
- emotional distress, fear, intimidation, and disruption of Plaintiffs' ability to vindicate their rights.

The private Defendants are therefore properly treated as acting under color of state law for purposes of Plaintiffs' § 1983 claims because the challenged conduct was accomplished through joint participation, conspiracy, substantial cooperation, and coordinated action with law-enforcement personnel acting with official authority. Any reliance on Tex. Civ. Prac. & Rem. Code § 74.351 is misplaced. See *Passmore*

# VI. REQUEST FOR IMMEDIATE INJUNCTIVE RELIEF

Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

Plaintiffs seek immediate injunctive relief to prevent ongoing and irreparable harm resulting from Defendants' continued withholding of medical and laboratory records.

## A. Ongoing Violation of Federal Right of Access

Under the Health Insurance Portability and Accountability Act ("HIPAA"), individuals have a legally enforceable right to access their protected health information.

See 45 C.F.R. § 164.524.

This right includes:

- the right to obtain copies of medical records;
- the right to direct records to a third party;
- the right to make requests in writing, including by electronic means;

The U.S. Department of Health and Human Services ("HHS") has expressly clarified that:

- requests for records **may be submitted by email**;
- covered entities **may not impose unreasonable barriers** to access;
- entities **may not require unnecessary forms or procedures** that delay access;

Defendants' conduct, as described herein, violates these requirements.

## B. Pattern of Obstruction and Refusal

Defendants have not merely delayed production — they have engaged in a pattern of obstruction, including:

- imposing shifting and inconsistent requirements;
- requiring execution of Defendants' preferred forms;

- directing Plaintiffs to proprietary electronic systems;
- failing to produce complete records despite repeated requests;

These actions constitute unreasonable barriers to access under federal law.

## C. Irreparable Harm

Plaintiffs are suffering ongoing and irreparable harm, including:

- inability to ensure continuity of medical care;
- inability to provide complete records to a new provider;
- inability to make informed medical decisions;
- impairment of Plaintiffs' ability to investigate and pursue legal claims;

Medical records are uniquely within Defendants' control.

No adequate remedy at law exists to compensate for:

- loss of treatment opportunity;
- delay in fertility care;
- inability to verify embryo handling;

## D. Likelihood of Success on the Merits

Plaintiffs are likely to succeed on the merits because:

- federal law clearly provides a right of access to medical records;
- Defendants have failed to comply with that obligation;
- Defendants have imposed barriers expressly prohibited by HHS guidance;

## E. Balance of Equities

The balance of equities strongly favors Plaintiffs.

Requiring Defendants to produce records imposes minimal burden, as such records already exist within Defendants' possession and control.

By contrast, Plaintiffs face significant and ongoing harm from continued withholding.

## F. Public Interest

The public interest favors enforcement of federal law guaranteeing patient access to medical records and continuity of care.

## G. Requested Relief

Plaintiffs respectfully request that the Court:

1.  Order Defendants to immediately produce all medical and laboratory records relating to Plaintiffs, including but not limited to:
    o   embryology records
    o   chain-of-custody documentation
    o   thaw and re-freeze records
    o   consent documentation
    o   internal communications
2.  Order that such production be completed within a fixed and expedited timeframe;
3.  Prohibit Defendants from imposing additional conditions, forms, or barriers to production;
4.  Grant such further relief as necessary to ensure Plaintiffs' access to records. Any reliance on Tex. Civ. Prac. & Rem. Code § 74.351 is misplaced. See *Passmore*

# VII. CAUSES OF ACTION

## COUNT 1 — FIRST AMENDMENT (RIGHT TO PETITION)

42 U.S.C. § 1983**

Plaintiffs incorporate all preceding paragraphs.

The First Amendment protects the right to petition the government for redress of grievances, including the right to pursue legal claims and access the courts.

Plaintiffs engaged in protected activity, including:

*   requesting medical and laboratory records;
*   filing a Rule 202 petition in Collin County, Texas;
*   investigating and pursuing legal claims arising from Defendants' conduct;

Defendants, acting individually and in concert, engaged in conduct that interfered with Plaintiffs' exercise of those rights, including:

- restricting Plaintiffs' ability to communicate with Dallas IVF personnel;
- threatening criminal prosecution for continued communication;
- escalating the matter to law enforcement;
- causing or facilitating trespass enforcement against Plaintiffs;

Defendant **Officer Pringle**, acting under color of state law, enforced restrictions and threats that burdened Plaintiffs' ability to pursue legal remedies.

Defendants' actions would deter a person of ordinary firmness from continuing to engage in protected activity.

Defendants' conduct further constitutes unlawful retaliation against Plaintiffs for engaging in protected activity. Plaintiffs' requests for records and filing of a Rule 202 petition were protected under the First Amendment. Defendants responded with adverse actions, including threats of criminal enforcement, law enforcement escalation, and system-wide trespass restrictions. The close temporal proximity between Plaintiffs' protected activity and Defendants' actions supports a causal inference of retaliatory motive. Such conduct would deter a person of ordinary firmness from continuing to engage in protected activity.

Defendants' threats of criminal enforcement for future communication further operated as a prior restraint on Plaintiffs' protected speech and petitioning activity

As a result, Plaintiffs suffered damages.

---

## COUNT 2 — FOURTH AMENDMENT (UNREASONABLE SEIZURE)

42 U.S.C. § 1983**

Plaintiffs incorporate all preceding paragraphs.

The Fourth Amendment protects individuals from unreasonable seizures.

A seizure occurs when a person's freedom of movement is restrained by means of physical force or a show of authority.

Defendant **Officer Pringle**, acting under color of state law:

- informed Plaintiffs that they were trespassed from multiple locations;
- imposed restrictions on Plaintiffs' ability to access those locations;
- expressly threatened Plaintiffs with arrest if they attempted to enter those locations;

These actions constituted a show of authority restricting Plaintiffs' freedom of movement.

At the time of these actions:

- Plaintiffs had not been physically present on the properties at issue;
- no probable cause existed to support trespass enforcement;

The enforcement of system-wide trespass restrictions based solely on third-party allegations, without independent verification, was unreasonable. The trespass determination and resulting restrictions were based on unverified and materially unreliable information provided by third parties and were adopted without independent investigation, rendering the seizure objectively unreasonable.

As a result, Plaintiffs suffered damages.

## COUNT 3 — FIFTH AND FOURTEENTH AMENDMENTS (DUE PROCESS)

42 U.S.C. § 1983**

Plaintiffs incorporate all preceding paragraphs.

The Fifth and Fourteenth Amendments prohibit the deprivation of liberty or property without due process of law.

Plaintiffs possessed protected interests, including:

- access to their medical and laboratory records;
- the ability to seek medical care and continuity of treatment;
- freedom of movement;

Defendants deprived Plaintiffs of these interests by:

- withholding records within their exclusive control;
- imposing shifting and inconsistent requirements for access;
- restricting Plaintiffs' ability to communicate with Defendants;
- causing or facilitating law enforcement restrictions and threats of arrest;

These deprivations occurred:

- without notice;
- without a meaningful opportunity to be heard;
- without any established procedural safeguards;

The actions taken were arbitrary and lacked a lawful basis.

Defendants further deprived Plaintiffs of liberty interests through stigmatizing accusations combined with tangible restrictions. Plaintiffs were accused of conduct warranting criminal enforcement, including being characterized as engaging in conduct subject to criminal charges, while simultaneously being subjected to system-wide trespass restrictions and threats of arrest. This combination of reputational harm and concrete restrictions constitutes a deprivation of liberty without due process of law.

As a result, Plaintiffs suffered damages.

## COUNT 4 — FOURTEENTH AMENDMENT (DENIAL OF ACCESS TO COURTS)

42 U.S.C. § 1983**

Plaintiffs incorporate all preceding paragraphs.

The Fourteenth Amendment protects the right of access to the courts.

Plaintiffs were engaged in pursuing legal remedies, including:

- filing a Rule 202 petition;
- investigating claims arising from Defendants' conduct;

Defendants interfered with Plaintiffs' ability to pursue those claims by:

- failing to produce necessary medical and laboratory records;
- imposing barriers to access those records;
- restricting Plaintiffs' ability to communicate with Defendants;
- escalating the matter to law enforcement;
- facilitating or causing trespass restrictions that deterred Plaintiffs from pursuing further action;

Defendant **Officer Pringle**, acting under color of state law, enforced restrictions that further impaired Plaintiffs' ability to pursue legal remedies.

As a result, Plaintiffs' ability to meaningfully access the courts was impaired.

Plaintiffs suffered damages as a result.

## COUNT 5 — CIVIL CONSPIRACY

42 U.S.C. § 1983**

Plaintiffs incorporate all preceding paragraphs.

Defendants acted in concert and reached an understanding to accomplish an unlawful objective or to accomplish a lawful objective by unlawful means.

Participants in the conspiracy included:

- Dallas IVF and its agents and employees;
- personnel associated with Baylor Scott & White Health;
- Defendant Officer Pringle;

The conspiracy involved:

- initiating complaints to law enforcement based on Plaintiffs' lawful conduct;
- causing or facilitating trespass enforcement against Plaintiffs;
- restricting Plaintiffs' ability to communicate and obtain records;
- interfering with Plaintiffs' pursuit of legal remedies;

Overt acts in furtherance of the conspiracy included:

- communications with law enforcement;
- issuance and enforcement of trespass restrictions;
- threats of arrest;

Defendants knew or reasonably should have known that these actions would interfere with Plaintiffs' constitutional rights.

As a result of the conspiracy, Plaintiffs suffered damages.

## COUNT 6 – NEGLIGENCE (INCLUDING HEALTH CARE LIABILITY CLAIM)

Defendants owed Plaintiffs a duty to exercise ordinary care consistent with the accepted standards applicable to reproductive medicine, IVF procedures, embryology laboratory practices, and the administrative and custodial functions necessary to ensure safe, continuous, and effective patient care.

This duty included, but was not limited to:
• proper embryo identification, verification, and handling
• maintenance of accurate and complete medical and laboratory records
• preservation of embryology records, including thaw logs, chain-of-custody documentation, and

embryo tracking
• timely disclosure of material information during treatment
• obtaining informed consent under non-coercive and adequately informed circumstances
• timely release and transfer of embryos upon valid authorization
• timely production and transmission of records necessary for continuity of care

Defendants breached these duties through a series of acts and omissions occurring across multiple stages of care:

## A. Laboratory Negligence

• thawing an embryo contrary to Plaintiffs' documented and verified selection
• failing to follow required embryo identification and verification protocols, including two-person verification safeguards
• failing to maintain proper chain-of-custody controls over embryos
• failing to properly track and document embryo identity, status, and handling

## B. Procedural and Clinical Negligence

• failing to timely disclose a material laboratory error during an active medical procedure
• proceeding with embryo transfer under compromised conditions without reassessment
• failing to offer or allow delay or cancellation of the procedure under non-compromised conditions
• performing a transfer when conditions were not optimal and without adequate disclosure

## C. Administrative and Custodial Negligence

• failing to maintain and produce complete and accurate medical and laboratory records
• failing to timely transmit records to Plaintiffs and to a subsequent provider despite valid authorization
• selectively producing incomplete records while withholding material records within Defendants' possession, custody, and control
• failing to provide records necessary for continuity of care during a time-sensitive course of fertility treatment

• failing to timely release Plaintiffs' embryos after receiving valid authorization for transfer
• conditioning the release of embryos on unnecessary administrative requirements, including additional consent forms, notarization, and payment of fees not required under the governing agreement

• refusing to proceed with transfer unless Plaintiffs complied with Defendants' internal requirements, including notarized forms and payment of a coordination fee

• failing to act upon Plaintiffs' lawful instructions regarding the disposition and transfer of embryos

### D. Transfer and Post-Release Negligence

• mishandling embryos during the transfer process
• failing to properly verify embryo identity prior to shipment
• mistakenly including and shipping embryos not designated for transfer
• failing to ensure accurate classification and segregation of embryos prior to release

These breaches were not isolated, but occurred as part of a continuous course of conduct spanning laboratory operations, clinical decision-making, administrative control, recordkeeping, and embryo transfer.

Defendants knew or should have known that their conduct created a substantial risk of harm to Plaintiffs' reproductive interests and ability to successfully complete fertility treatment.

These breaches were a proximate cause of Plaintiffs' injuries, including:

• loss of embryo viability
• failed implantation
• interference with reproductive treatment
• loss of reproductive opportunity
• delay and disruption of fertility care
• loss of insurance-covered treatment opportunities
• increased medical costs
• impairment of Plaintiffs' ability to make informed medical decisions
• emotional distress

## COUNT 7 – LACK OF INFORMED CONSENT

Defendants owed Plaintiffs a duty to disclose all material information, risks, alternatives, and circumstances necessary for Plaintiffs to make an informed, voluntary, and intelligent decision regarding whether to proceed with embryo transfer.

This duty includes the obligation to provide timely, complete, and accurate information before and during the procedure, particularly when material conditions change or when a known error occurs.

Defendants breached this duty by failing to disclose, fully and timely, material information including, but not limited to:

• that an embryo inconsistent with Plaintiffs' documented selection had been thawed
• the nature, significance, and implications of that laboratory error
• the risks associated with rapidly thawing and transferring a different embryo under time-compressed and altered conditions
• the impact of timing disruption on embryo viability, uterine receptivity, and implantation success
• the option to delay, cancel, or reschedule the procedure under appropriate and controlled conditions
• that Plaintiffs were being asked to proceed under circumstances materially different from those originally planned and consented to

Defendants further failed to disclose critical information affecting the physician–patient relationship and Plaintiffs' ability to rely on Defendants' judgment.

Upon information and belief, Defendants had already made the decision to terminate the physician–patient relationship on or about August 19, 2024, prior to performing the embryo transfer on August 23, 2024.

Plaintiffs were not informed of this decision prior to or during the procedure. Instead, Plaintiffs proceeded with treatment under the reasonable belief that Defendants remained committed to their ongoing care.

Defendants' failure to disclose the pending termination of the physician–patient relationship deprived Plaintiffs of material information necessary to evaluate whether to proceed with treatment under those circumstances.

Defendants further failed to disclose material information in a timely and meaningful manner. Plaintiffs were left for an extended period during the procedure without explanation while Defendants addressed the laboratory error, and material information was not provided until after Plaintiffs were placed in a state of uncertainty, distress, and time pressure.

Defendants presented the situation in a manner that minimized the significance of the error and conveyed that it was "not a big deal," thereby impairing Plaintiffs' ability to appreciate the risks and make a reasoned decision.

Any purported consent obtained under these conditions was not informed, voluntary, or meaningful, but was instead the product of incomplete disclosure, time pressure, emotional distress, and lack of transparency regarding the status of the physician–patient relationship.

A reasonable patient, fully informed of the true circumstances—including the laboratory error, associated risks, available alternatives, and the impending termination of care—would not have consented to proceed under such conditions.

Defendants' failure to obtain informed consent was a proximate cause of Plaintiffs' injuries, including failed implantation, loss of reproductive opportunity, and emotional distress.

## COUNT 8 – PATIENT ABANDONMENT

Defendants owed Plaintiffs a duty not to terminate the physician–patient relationship without providing reasonable notice and without ensuring continuity of care during an ongoing and active course of medical treatment.

This duty includes the obligation to:
• provide advance notice of termination sufficient to allow a patient to secure alternative care
• avoid terminating the relationship during a critical stage of treatment without appropriate transition planning
• continue providing necessary care until the patient has a reasonable opportunity to obtain substitute medical services

Defendants breached this duty by engaging in a course of conduct that effectively terminated the physician–patient relationship without reasonable notice and without continuity of care.

Upon information and belief, Defendants made the decision to terminate the physician–patient relationship on or about August 19, 2024.

Despite this decision, Defendants:

• failed to disclose the termination decision prior to the scheduled embryo transfer on August 23, 2024
• proceeded with and performed the embryo transfer while withholding the fact that the physician–patient relationship had already been terminated
• failed to provide Plaintiffs with any meaningful opportunity to seek alternative care prior to undergoing the procedure
• issued written notice of termination only after the procedure had been completed

At all relevant times, Plaintiffs reasonably believed that Defendants remained their treating providers and would continue to provide care and support during and after the embryo transfer.

Defendants' conduct deprived Plaintiffs of the ability to make informed decisions regarding whether to proceed with treatment and prevented them from arranging for alternative medical care during a critical and time-sensitive phase of fertility treatment.

Defendants' termination of the physician–patient relationship under these circumstances occurred without reasonable notice, without transition of care, and at a time when Plaintiffs required ongoing medical supervision and support.

As a direct and proximate result of Defendants' conduct, Plaintiffs suffered damages, including:

• lack of continuity of care during a critical phase of treatment
• inability to secure alternative medical providers prior to the procedure
• increased risk of adverse treatment outcomes
• emotional distress and anxiety
• interference with Plaintiffs' ability to safely and effectively continue fertility treatment

## COUNT 9 – CORPORATE NEGLIGENCE

Defendant Dallas IVF owed a duty to ensure that its facility, staff, and laboratory operations complied with accepted standards and safety protocols.

Dallas IVF breached this duty by:

• failing to properly train and supervise embryology personnel
• failing to enforce embryo identification and verification protocols
• failing to maintain adequate safeguards to prevent embryo misidentification
• failing to implement or enforce two-person verification procedures
• failing to properly document and respond to laboratory errors

These systemic failures were a producing cause of the events described herein.

## COUNT 10 – BREACH OF CONTRACT

Plaintiffs entered into written and/or oral agreements with Defendants governing the storage, identification, selection, handling, and transfer of Plaintiffs' embryos, as well as the provision of related fertility services.

Under these agreements, Defendants agreed and were obligated to:

• follow Plaintiffs' documented embryo selection and instructions
• maintain accurate identification, tracking, and chain-of-custody of embryos
• handle and preserve embryos in accordance with established medical and laboratory protocols
• perform procedures consistent with Plaintiffs' directives and informed consent
• maintain and provide accurate medical and laboratory records
• timely release and transfer embryos upon Plaintiffs' valid authorization

Defendants materially breached these agreements by, among other things:

- thawing an embryo contrary to Plaintiffs' explicit and documented selection
- failing to adhere to agreed-upon embryo selection criteria and verification procedures
- performing procedures outside the scope of Plaintiffs' consent and instructions

- failing to maintain proper control, tracking, and identification of embryos
- failing to provide complete and accurate records as required under the agreement
- failing to timely release and transfer embryos after receiving valid authorization

- conditioning release of embryos on additional requirements not contained in the governing agreement, including execution of additional consent forms, notarization, and payment of fees

- mishandling embryos during the transfer process, including the shipment of embryos not designated for transfer

These breaches were material and went to the essence of the agreements, which were to ensure that Plaintiffs' embryos were handled, controlled, and transferred strictly in accordance with Plaintiffs' directives and expectations.

As a direct and proximate result of Defendants' breaches, Plaintiffs suffered damages, including:

- loss of use and control of embryos
- interference with fertility treatment
- delay in achieving pregnancy
- increased medical costs
- loss of reproductive opportunity
- emotional distress

## COUNT 11 – BAILMENT / BREACH OF DUTY OF CUSTODY

Plaintiffs entrusted their cryopreserved embryos to Defendants for safekeeping, storage, preservation, and controlled handling, thereby creating a bailment relationship.

Under this bailment, Defendants owed Plaintiffs a duty to exercise reasonable care in the custody, control, identification, preservation, and handling of the embryos, and to act in accordance with Plaintiffs' instructions regarding their use and disposition.

This duty included, but was not limited to:

- maintaining secure custody and control over the embryos
- ensuring accurate identification, labeling, and tracking of each embryo
- maintaining proper chain-of-custody and documentation of all handling
- safeguarding embryos from unauthorized handling, manipulation, or alteration
- releasing and transferring embryos in accordance with Plaintiffs' lawful instructions

Defendants breached these duties through a series of acts and omissions, including:

• thawing an embryo without authorization and contrary to Plaintiffs' instructions
• subjecting an embryo to an unnecessary and unauthorized freeze–thaw cycle
• failing to maintain proper chain-of-custody controls and verification safeguards

• retaining possession of the embryos after Plaintiffs made lawful demand for release and provided valid authorization
• failing to release embryos in a timely manner and continuing to exercise control over them for non-medical reasons

• mishandling embryos during the transfer process, including the inclusion and shipment of embryos not designated for transfer
• failing to properly verify, segregate, and identify embryos prior to release

These acts constitute a failure to exercise reasonable care in the custody and control of Plaintiffs' embryos and a breach of Defendants' duties as bailees.

Defendants' conduct was not limited to a single incident, but reflects a continuing failure to properly safeguard and control Plaintiffs' property.

As a direct and proximate result of Defendants' breach of their duties, Plaintiffs suffered damage to their property interests in the embryos, loss of control over their disposition, interference with their intended use, and associated emotional and financial harm.

## COUNT 12 – NEGLIGENT MISREPRESENTATION

Defendants made representations to Plaintiffs that:

• the laboratory error was "not a big deal"
• proceeding with the transfer would not materially impact the outcome

These representations were false or made without reasonable basis.

Defendants failed to disclose material facts necessary to make these representations not misleading.

Plaintiffs reasonably relied on these statements in deciding to proceed with the transfer.

Such reliance resulted in injury.

## COUNT 13 – FRAUD BY NONDISCLOSURE

Defendants had a duty to disclose material facts to Plaintiffs arising from the physician–patient relationship, the provision of medical services, and Defendants' superior knowledge of information not reasonably available to Plaintiffs.

This duty included the obligation to disclose material information necessary to prevent Plaintiffs from being misled or acting under a mistaken understanding of critical facts.

Defendants failed to disclose material information, including but not limited to:

• the nature, significance, and full impact of the laboratory error involving the thawing of the incorrect embryo
• the risks associated with proceeding with embryo transfer under altered, time-compressed, and compromised conditions
• the availability of alternatives, including delaying or canceling the procedure
• that Plaintiffs were being asked to proceed under materially different conditions than those originally planned and consented to
• that Defendants had already made the decision to terminate the physician–patient relationship prior to the procedure

At the time of these omissions, Defendants knew that Plaintiffs were unaware of these material facts and were acting under a mistaken understanding of the circumstances.

Defendants further knew that Plaintiffs were relying on Defendants' expertise, representations, and disclosures in deciding whether to proceed with the embryo transfer.

Defendants intentionally failed to disclose these material facts and instead proceeded with treatment while allowing Plaintiffs to continue under a false or incomplete understanding of the situation.

Defendants' conduct included not only the failure to disclose material information, but also the creation and maintenance of a misleading impression that proceeding with the transfer under the circumstances was appropriate and acceptable.

Defendants intended that Plaintiffs rely on this incomplete and misleading information in deciding to proceed with the procedure.

Plaintiffs did, in fact, rely on Defendants' omissions and the misleading impression created by Defendants, and would not have proceeded with the embryo transfer had they been fully informed.

As a direct and proximate result of Defendants' fraud by nondisclosure, Plaintiffs suffered damages, including failed implantation, loss of reproductive opportunity, delay in treatment, and emotional distress.

# COUNT 14 – GROSS NEGLIGENCE

Defendants' conduct, viewed objectively from their standpoint at the time of the events in question, involved an extreme degree of risk considering the probability and magnitude of harm to Plaintiffs' reproductive interests.

The risks associated with Defendants' conduct were substantial and obvious and included, but were not limited to:
• the risk of embryo misidentification and unauthorized thawing
• the risk of diminished embryo viability resulting from improper handling and altered procedural conditions
• the risk of failed implantation due to proceeding under compromised circumstances
• the risk of harm resulting from withholding critical information necessary for informed consent
• the risk of interference with time-sensitive fertility treatment due to delay in releasing embryos
• the risk of additional harm arising from improper handling and transfer of embryos following release

Defendants had actual, subjective awareness of these risks, including knowledge of:
• the laboratory error involving thawing of the incorrect embryo
• the compromised conditions under which the subsequent transfer was performed
• Plaintiffs' expressed intent to transfer care and obtain their embryos
• the time-sensitive nature of IVF treatment and the impact of delay on treatment opportunities
• the consequences of failing to properly track, identify, and transfer embryos

Despite this knowledge, Defendants proceeded with conscious indifference to Plaintiffs' rights, safety, and reproductive interests by:

• proceeding with embryo transfer after a known laboratory error without reassessment or adequate disclosure
• failing to provide timely and complete information necessary for informed decision-making
• continuing to exercise control over Plaintiffs' embryos after receiving valid authorization for release
• imposing additional administrative conditions on release, including requirements for additional consent forms, notarization, and payment of fees
• delaying the release of embryos for non-medical and administrative reasons despite knowing the time-sensitive nature of Plaintiffs' treatment
• mishandling embryos during the transfer process, including the shipment of embryos not designated for transfer

Defendants' conduct was not limited to a single incident, but instead reflects a pattern of repeated failures across multiple stages of care, including laboratory handling, clinical decision-making, administrative control, and post-release transfer.

This pattern of conduct demonstrates an extreme degree of risk and a conscious indifference to Plaintiffs' rights sufficient to constitute gross negligence.

As a direct and proximate result of Defendants' gross negligence, Plaintiffs suffered damages, including loss of reproductive opportunity, failed implantation, interference with fertility treatment, increased medical expenses, and severe emotional distress.

Defendants' conduct entitles Plaintiffs to the recovery of exemplary damages.

## COUNT 15 – CONVERSION AND WRONGFUL EXERCISE OF CONTROL OVER EMBRYOS

Plaintiffs possessed lawful possessory, ownership, contractual, and decision-making rights in and to their cryopreserved embryos, including the exclusive right to control their use, handling, disposition, and transfer.

Defendants held the embryos as custodians subject to Plaintiffs' directives and were obligated to comply with Plaintiffs' lawful instructions regarding the storage, handling, and release of the embryos.

Defendants nevertheless exercised dominion and control over Plaintiffs' embryos in a manner inconsistent with Plaintiffs' rights through a continuous course of unauthorized conduct, including but not limited to:

• thawing an embryo contrary to Plaintiffs' explicit instructions
• subjecting an embryo to an unauthorized and unnecessary freeze–thaw cycle
• manipulating embryos outside the scope of Plaintiffs' consent

• retaining possession of the embryos after Plaintiffs provided valid authorization and made lawful demand for release and transfer
• delaying the release and transfer of embryos for non-medical and non-regulatory reasons

• conditioning release of the embryos on compliance with additional internal requirements not required under the governing agreement, including execution of additional consent forms, notarization, and payment of fees

• using control over the embryos to impose coercive conditions, thereby forcing Plaintiffs to choose between surrendering legal rights or forfeiting timely access to their embryos and ability to proceed with treatment

• failing to act upon Plaintiffs' lawful instructions regarding the disposition and transfer of embryos

• mishandling embryos during the transfer process, including the shipment of embryos not designated for transfer

These acts constitute an intentional and/or wrongful exercise of dominion and control over Plaintiffs' embryos and are inconsistent with Plaintiffs' rights.

Defendants' conduct was not isolated, but occurred across multiple stages, including laboratory handling, post-procedure control, and transfer of embryos, and continued even after Plaintiffs made lawful demand for release.

As a direct and proximate result of Defendants' conduct, Plaintiffs were deprived of possession, use, and control of their embryos during a critical and time-sensitive period and suffered damages, including:

• interference with time-sensitive IVF treatment
• loss of opportunity to utilize embryos within an optimal treatment window
• loss of insurance-covered treatment opportunities
• increased medical expenses
• delay in achieving pregnancy
• loss of reproductive opportunity
• emotional distress

Defendants' conduct was intentional, willful, and/or in reckless disregard of Plaintiffs' rights, entitling Plaintiffs to the recovery of exemplary damages.

## COUNT 16 – LOSS OF CONSORTIUM

Plaintiff Anthony Greer brings this claim for loss of consortium arising from the injuries sustained by Plaintiff Allison Greer as a direct and proximate result of Defendants' acts and omissions as alleged herein.

As a result of Defendants' conduct, Plaintiff Allison Greer suffered significant physical, emotional, and psychological harm, including:

• physical pain, discomfort, and side effects associated with hormonal treatments and invasive medical procedures
• emotional distress, grief, and mental anguish arising from the mishandling of embryos, failed transfer, and disruption of fertility treatment
• interruption and impairment of her reproductive health and ongoing IVF treatment process

These injuries have had a direct and continuing impact on the marital relationship between Plaintiffs.

As a direct and proximate result, Plaintiff Anthony Greer has suffered damages including:

• loss of companionship, comfort, and affection
• loss of emotional support and shared experiences
• loss of intimacy and disruption of the marital relationship

• strain on the marital relationship caused by the emotional and physical effects of Defendants' conduct

• loss of the shared ability to pursue and experience family-building and parenthood as planned

These harms are ongoing in nature and were a foreseeable consequence of Defendants' conduct.

Plaintiff Anthony Greer seeks recovery for all damages allowed by law resulting from the loss of consortium.

# COUNT 17 – VIOLATION OF TEXAS DECEPTIVE TRADE PRACTICES ACT

Plaintiffs, and individually Plaintiff Anthony Greer, are consumers within the meaning of the Texas Deceptive Trade Practices Act because they sought and acquired goods and services from Defendants, including fertility-related services, laboratory services, and associated representations made in connection with those services.

Plaintiff Anthony Greer was not a medical patient of Defendants and did not receive diagnosis, treatment, or medical care. His relationship with Defendants was consumer-based and transactional in nature, including:

• providing biological material required for IVF procedures
• participating in treatment-related decisions
• communicating directly with Defendants regarding services
• incurring and/or being responsible for payment of services and related expenses

Accordingly, Plaintiff Anthony Greer's claims arise from Defendants' business, marketing, and consumer-facing conduct and do not depend upon or arise from the exercise of medical judgment.

## A. False, Misleading, or Deceptive Acts and Practices

Defendants engaged in false, misleading, or deceptive acts and practices in the conduct of trade and commerce, including but not limited to the following:

### 1. Misrepresentations in Marketing and Patient-Facing Materials

Defendants represented, through marketing materials, physician biographies, and patient-facing communications, that their services would be performed with specialized expertise, reliability, accuracy, and care.

These representations included statements regarding Dr. Dara Havemann's personal experience with infertility, PCOS, and successful IVF treatment, which were intended to establish credibility, build trust, and influence consumer decision-making.

Defendants failed to disclose material facts necessary to make these representations not misleading, including deficiencies in their laboratory safeguards, identification protocols, and error-prevention systems.

Plaintiffs relied on these representations in selecting Defendants as their fertility provider.

### 2. Misleading Statements During the Provision of Services

During the course of services, Defendants made representations to Plaintiffs, including that:

• the laboratory error was "not a big deal"
• proceeding with embryo transfer under the circumstances would not materially affect the outcome

These representations were made without disclosure of material facts necessary to render such statements not misleading, including the actual risks associated with embryo misidentification, rapid thaw under altered conditions, and compromised procedural timing.

These statements were made while Plaintiffs were in a vulnerable position and actively relying on Defendants' expertise.

### 3. Failure to Disclose Material Information

Defendants failed to disclose material information, including:

• the nature, severity, and implications of the laboratory error
• the risks associated with proceeding under altered timing and compromised conditions
• the availability of alternatives, including delaying or canceling the procedure
• that Defendants had already made the decision to terminate the physician–patient relationship prior to the procedure

Defendants had a duty to disclose this information because:

• the information was material to Plaintiffs' decision-making
• Defendants possessed superior knowledge and exclusive access to the information
• Plaintiffs were actively engaged in a consumer transaction and relying on Defendants' disclosures

**4. Deceptive and Unfair Business Practices Independent of Medical Judgment**

The conduct at issue includes Defendants' marketing, representations, omissions, and administrative practices directed toward Plaintiffs as consumers.

As to Plaintiff Anthony Greer, these claims arise entirely from consumer transactions and business conduct and do not involve the provision of medical care or the exercise of medical judgment.

## B. Producing Cause and Reliance

Defendants' false, misleading, and deceptive acts and practices were a producing cause of Plaintiffs' damages.

Plaintiffs relied on Defendants' representations and omissions in:

• selecting Defendants as their fertility provider
• agreeing to proceed with embryo transfer under compromised conditions
• continuing participation in the IVF process
• incurring financial obligations associated with treatment

Such reliance was reasonable under the circumstances.

## C. Knowing and Intentional Conduct

Defendants' conduct was committed knowingly, and in some instances intentionally, as Defendants were aware of the true facts and failed to disclose them while continuing to provide services and accept payment.

## D. Damages Under the Act

As a result of Defendants' conduct, Plaintiffs have suffered damages recoverable under the Act, including economic damages and other relief permitted by law.

Plaintiffs seek all relief available under the Texas Deceptive Trade Practices Act, including:

• economic damages
• additional damages for knowing or intentional conduct
• costs of court
• reasonable and necessary attorney's fees

## COUNT 18 – TORTIOUS INTERFERENCE WITH PLAINTIFFS' RIGHT TO ACCESS AND TRANSFER EMBRYOS AND INTERFERENCE WITH MEDICAL TREATMENT

Plaintiffs had the lawful right to access, control, and transfer their cryopreserved embryos to a provider of their choosing.

Defendants were aware of this right and were further aware that Plaintiffs intended to transfer their embryos and continue fertility treatment with another provider.

Defendants were placed on notice of Plaintiffs' intent to transfer embryos no later than September 27, 2024, when Plaintiffs communicated their position and rejected additional consent requirements.

On or about October 23, 2024, Plaintiffs provided Defendants with a valid, notarized authorization directing the release and transfer of their embryos.

Despite this authorization, Defendants intentionally and knowingly interfered with Plaintiffs' rights by imposing additional conditions and delaying release.

Defendants expressly informed Plaintiffs that they "need[ed] these [consents] filled out in order to move forward," required that "both forms [be] notarized," required that "originals [be] sent over," and further required payment of a "ship out coordination fee of $150 due prior to the release."

These requirements were imposed as a prerequisite to releasing Plaintiffs' embryos, despite Plaintiffs having already provided valid authorization and having rejected additional consent requirements.

Defendants' conduct demonstrates that release of the embryos was conditioned on compliance with Defendants' internal administrative demands, rather than any medical necessity or regulatory requirement.

Defendants further delayed the transfer by subjecting Plaintiffs' request to internal administrative review and by refusing to act upon Plaintiffs' lawful instructions.

These actions were administrative and custodial in nature and did not involve the exercise of medical judgment.

Defendants knew or should have known that IVF treatment is time-sensitive and that delays in transferring embryos would materially interfere with Plaintiffs' ability to continue treatment.

Defendants further knew that Plaintiffs' ability to proceed with treatment was limited by insurance coverage expiring at the end of the calendar year.

Despite this knowledge, Defendants continued to delay release of the embryos until approximately November 7, 2024.

As a direct and proximate result of Defendants' interference, Plaintiffs were unable to complete an additional IVF transfer cycle within the available insurance coverage period.

Defendants' conduct interfered with Plaintiffs' ability to:
• access and control their embryos
• transfer embryos to a provider of their choosing
• continue fertility treatment without disruption
• make timely medical decisions regarding embryo transfer

As a result of Defendants' conduct, Plaintiffs suffered damages, including:

• loss of insurance-covered IVF treatment
• increased out-of-pocket medical expenses
• delay in achieving pregnancy
• loss of reproductive opportunity
• emotional distress

Defendants' interference was intentional, willful, and carried out with conscious disregard of Plaintiffs' rights, entitling Plaintiffs to recovery of all available damages.

# COUNT 19 – MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983 (MONELL)

**(Against Defendant Baylor Scott & White Health)**

Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

### A. Policy, Practice, or Custom

Defendant **Baylor Scott & White Health**, acting through its hospital police department, maintained and enforced policies, practices, or customs that were the moving force behind the deprivation of Plaintiffs' constitutional rights.

Such policies, practices, or customs include, but are not limited to:

- permitting officers to issue **system-wide criminal trespass warnings** without adequate investigation;

- relying on **unverified third-party complaints**, including those from private tenants or affiliated entities;
- failing to require independent assessment of whether an individual is engaged in **lawful activity**, including litigation-related conduct;
- allowing escalation of civil or administrative disputes into **law enforcement actions** without constitutional safeguards;

## B. Decision by a Final Policymaker (Single-Incident Liability)

The constitutional violations described herein were caused by a decision of a final policymaker.

The Baylor police officer who issued and/or enforced the trespass warning identified himself as a **captain** and exercised authority to impose and enforce a **system-wide ban across all Baylor facilities**.

This action:

- was immediate and not presented as subject to further review;
- applied broadly across multiple locations;
- functioned as a final determination of Plaintiffs' access to Defendant's medical system;

Upon information and belief, this authority reflects **delegated final policymaking authority** with respect to trespass enforcement decisions.

The issuance of a system-wide trespass ban affecting access to multiple facilities is not a routine discretionary act, but a **policy-level decision**, thereby rendering the resulting constitutional violations attributable to Defendant under Monell.

## C. Failure to Train / Supervise (Deliberate Indifference)

Defendant acted with deliberate indifference to the constitutional rights of individuals, including Plaintiffs, by failing to adequately train and supervise its hospital police officers regarding:

- the limits imposed by the First Amendment, including the right to petition and engage in lawful litigation-related activity;
- the protections of the Fourth Amendment, including the prohibition on unreasonable restrictions on movement and access;
- the requirement to conduct an **independent investigation** before depriving individuals of liberty or access to property open to the public;

Defendant further failed to implement policies requiring:

- verification of allegations made by private complainants;
- supervisory review of system-wide trespass decisions;
- safeguards to prevent misuse of police authority to enforce private disputes;

## D. Causation – Moving Force

As a direct and proximate result of Defendant's policies, customs, practices, and failures:

- Plaintiffs were subjected to a **system-wide trespass ban**;
- law enforcement presence was **escalated unnecessarily**;
- Plaintiffs were deprived of rights secured by the Constitution, including:
  - the right to petition and engage in protected activity;
  - the right to be free from unreasonable seizure and restraint;

These constitutional violations were not isolated incidents, but were taken pursuant to Defendant's policies, customs, and practices, and were the **moving force** behind the harm suffered by Plaintiffs.

## E. Lack of Review / Finality

Upon information and belief, Defendant did not provide:

- any meaningful mechanism for review or appeal of the trespass determination;
- any requirement for higher-level authorization prior to imposing a system-wide ban;

The absence of such safeguards supports the inference that the decision was **final and attributable to Defendant**.

## F. Damages

As a result of the foregoing, Plaintiffs have suffered damages as previously alleged, including but not limited to:

- deprivation of constitutional rights;
- interference with access to medical care and facilities;
- emotional distress and mental anguish;

# VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that Defendants be cited to appear and answer, and that upon final trial, Plaintiffs recover judgment against Defendants as follows:

## A. Compensatory Damages

For actual damages in an amount to be determined at trial, including but not limited to:

- loss of reproductive opportunity
- damage to and loss of use of embryos
- medical expenses, past and future
- physical pain and suffering
- emotional distress and mental anguish
- loss of consortium
- financial losses and out-of-pocket expenses

## B. Constitutional Damages

For damages arising from violations of Plaintiffs' constitutional rights under 42 U.S.C. § 1983, including:

- interference with the right to petition the government
- denial of access to the courts
- unlawful seizure and restriction of movement
- deprivation of liberty and property without due process

## C. Exemplary and Punitive Damages

For exemplary and punitive damages in an amount sufficient to punish Defendants and deter similar conduct, based on Defendants' willful, malicious, and retaliatory actions, including:

- escalation to law enforcement following Plaintiffs' Rule 202 filing
- threats of arrest in response to lawful legal activity
- coercive conduct designed to suppress Plaintiffs' pursuit of legal remedies

## D. Total Monetary Relief

Plaintiffs seek total monetary relief in an amount not less than **$50,000,000**, to be determined by the jury, based on the full extent of Defendants' conduct and resulting harm.

## E. Injunctive Relief

For temporary, preliminary, and permanent injunctive relief, including but not limited to:

- prohibiting Defendants from interfering with Plaintiffs' access to medical records
- prohibiting further coercive or retaliatory conduct
- requiring preservation and production of all relevant records and evidence

## F. Declaratory Relief

For a declaration that Defendants' conduct violated Plaintiffs' constitutional and legal rights.

## G. Attorneys' Fees and Costs

For recovery of attorneys' fees and costs as allowed by law, including under 42 U.S.C. § 1988 and the Texas Deceptive Trade Practices Act.

## H. Other Relief

For such other and further relief, at law or in equity, to which Plaintiffs may be justly entitled.

# IX. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure, including but not limited to all claims for damages arising under federal and state law.

# X. SIGNATURE BLOCK

Respectfully submitted,

/s/ **Anthony John Greer, Jr.**
Anthony John Greer, Jr.
2428 Limerick Dr
Princeton, TX 75407
Telephone: (817)987-8239
Email: greer.anthony33@gmail.com

**Plaintiff, Pro Se**

/s/ **Allison Greer**
Allison Greer
**Plaintiff, Pro Se**